## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **DOUGLAS M. JACKSON**, | ) | |
| Plaintiff, | ) | Civil Action No. 1:07cv00056 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security**, | ) | By: Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

### I. Background and Standard of Review

The plaintiff, Douglas M. Jackson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Jackson's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

Case 1:07-cv-00056-PMS   Document 13   Filed 02/13/08   Page 1 of 26   Pageid#: 368

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jackson filed his application for DIB on or about October 14, 2004, (Record, ("R."), at 50-52), alleging disability as of July 1, 2004, due to back, hip and arm problems, carpal tunnel syndrome and high blood pressure.[1] (R. at 18, 50, 103, 312.) The claim was denied initially and upon reconsideration. (R. at 37-39, 42, 44-46.) Jackson then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 47.) The ALJ held a hearing on June 29, 2006, at which Jackson was represented by counsel. (R. at 290-313.)

By decision dated August 17, 2006, the ALJ denied Jackson's claim. (R. at 17-23.) The ALJ found that Jackson met the nondisability insured status requirements of the Act for DIB purposes through at least the date of the decision. (R. at 22.) The ALJ determined that Jackson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ also found that Jackson had a medically determinable severe impairment, when his right shoulder disorder, post-traumatic epicondylitis of the right elbow, chronic lumbar strain and degenerative joint disease of the hands were considered in combination. (R. at 22.)

---

[1]Jackson initially alleged an onset date of August 15, 2004; however, the ALJ granted a motion to amend this date to July 1, 2004. (R. at 50, 103, 312.)

Case 1:07-cv-00056-PMS    Document 13    Filed 02/13/08    Page 2 of 26    Pageid#: 369

However, the ALJ found that Jackson's impairments, considered either singly or in combination, did not meet or equal the criteria of any impairment listed at, or medically equal to one listed at, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 22.) The ALJ also found that Jackson's allegations regarding his limitations were not fully credible. (R. at 22.) The ALJ determined that Jackson had the residual functional capacity to lift and carry items weighing up to 25 pounds occasionally and 15 pounds frequently, and that Jackson could stand and/or walk and sit for six hours in a typical eight-hour workday. (R. at 20, 22.) The ALJ also found that Jackson's past relevant work as a production manager, did not require the performance of work-related activities precluded by Jackson's residual functional capacity, and that Jackson's impairments did not prevent him from performing his past relevant work. (R. at 22.) Thus, the ALJ found that Jackson was not disabled at any time through at least the date of the ALJ's decision and was not entitled to DIB benefits. (R. at 22-23.) *See* 20 C.F.R. § 404.1520(f) (2007).

After the ALJ issued his decision, Jackson pursued his administrative appeals, (R. at 12), but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-7.) *See* 20 C.F.R. § 404.981 (2007). Thereafter, Jackson filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on Jackson's Motion For Summary Judgment filed December 3, 2007, and on the Commissioner's Motion For Summary Judgment filed December 20, 2007.

*II. Facts*

Jackson was born in 1945, which classifies him as a "person of advanced age" under 20 C.F.R. § 404.1563(e) (2007). (R. at 100.) According to the record, Jackson received his general equivalency development diploma, ("GED"); thus, Jackson has a "high school education" pursuant to 20 C.F.R. § 404.1564(b)(4) (2007). (R. at 106, 295.) In addition, Jackson has past relevant work experience as a production manager[2] and a supervisor. (R. at 21, 104.)

At Jackson's hearing before the ALJ on June 29, 2006, he testified that he could not work due to shoulder, back and hip problems and shortness of breath. (R. at 296, 309.) He stated that his hip bothered him when he had to lean over, and that his shoulder hurt constantly. (R. at 309.) Jackson testified that he had a "deteriorating disc" and a "bulging disc." (R. at 296.) Jackson noted that he was right-handed, and that his right shoulder gave him problems. (R. at 297.) He testified that he had a torn tendon in his right shoulder and that it "bother[ed]" him to twist a cap off a "two liter pop bottle." (R. at 297.) Jackson stated that he hurt his shoulder while trying to lift a piece of plywood in June 2003. (R. at 298, 303-04.) He stated that he had been undergoing physical therapy for a year and a half, but that "it [was] not doing a whole lot." (R. at 298.) Jackson also noted that his doctor had not recommended surgery. (R. at 298.) Jackson stated that his shoulder would improve for a month to six weeks after he had a steroidal injection, and then his symptoms would return. (R. at 299.) Jackson testified that he underwent therapy for about 45 minutes to an hour a day, and that he could drive a car with some limitation. (R. at 299-300.) He also stated that when driving a car, his fingers

---

[2]Jackson's job as a production manager is also referred to as "factory manager" in the record. (R. at 104.)

became numb, and that he often had to push his arm down on the armrest to alleviate the numbness. (R. at 300.)

Jackson testified that he last worked as a factory production manager, which involved about two hours of sitting and about six hours of walking in a typical eight-hour workday. (R. at 300.) Jackson started out as a machine operator in 1975 and eventually rose to a position where he oversaw about 265 employees, including five supervisors. (R. at 300-01, 306.) Jackson testified that he had to occasionally inspect parts and lift items weighing up to 50 or 60 pounds. (R. at 301-03.) Additionally, Jackson testified that his job required the use of two hands at times, and that he was "out on the floor" up to six hours in a typical eight-hour workday. (R. at 301-03.)

Jackson also remarked that he had emphysema, high blood pressure and carpal tunnel syndrome. (R. at 298, 300.) He stated that he had been smoking for 45 years and was trying to quit, and that his emphysema caused him to have shortness of breath. (R. at 298, 309.) He noted that his high blood pressure was controlled by medication. (R. at 309.)

In rendering his decision, the ALJ reviewed records from Dr. Samuel Vernon, M.D.; Smyth County Memorial Hospital; Smyth County Community Hospital; Bristol Regional Medical Center; Johnston Memorial Hospital; Dr. William Humphries, M.D.; Dr. Ralph Parks, M.D.; Dr. Beth Steinberger, D.O.; Dr. Michael J. Hartman, M.D., a state agency physician; and Dr. Frank M. Johnson, M.D., a state agency physician. Jackson's attorney submitted additional medical

records from Dr. Parks, Smyth County Community Hospital, Dr. Vernon and Dr. Carey W. McKain, M.D., to the Appeals Council.[3]

Jackson presented to Smyth County Community Hospital,[4] on May 3, 1991, for a computerized tomography scan, ("CT scan"), of his chest and upper gastrointestinal tract. (R. at 173.) The CT scan was negative for acute infiltrates and revealed moderate gastroduodenitis and a transitory delay in gastric emptying secondary thereto. (R. at 173.) A spirometry report dated December 13, 2000, revealed that Jackson had moderate obstruction as well as low vital capacity, possibly from a concomitant restrictive defect.[5] (R. at 172.) Another spirometry report from May 16, 2001, indicated that Jackson had a mild obstruction. (R. at 169.) Jackson presented to Bristol Regional Medical Center, ("BRMC"), on February 22, 2002, for a CT scan of his abdomen. (R. at 171.) The CT scan revealed generalized low-density configuration of the liver parenchyma with evidence of some hepatomegaly consistent with nonspecific fatty infiltration, several small nonobstructing renal calculi on the right and no focal lesions. (R. at 171.)

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[4]There are numerous records from Smyth County Community Hospital included in the administrative record, which have no relation to Jackson's current medical problems, or to his alleged disabilities. These records date as far back as 1984, are mostly illegible, are often duplicative of other records, often relate to acute conditions or conditions discussed in more detail in other medical records and will not be discussed in the facts section of the Memorandum Opinion.

[5]A spirometry report, dated January 1, 1990, revealed this same finding. (R. at 146.)

On December 13, 2000, Jackson presented to Dr. Samuel Vernon, M.D., for a yearly physical examination.[6] (R. at 125.) Dr. Vernon noted that Jackson smoked about a pack and a half of cigarettes a day, despite the fact that his father died of chronic obstructive pulmonary disease, ("COPD"), and that his mother also suffered from the disease. (R. at 125.) Dr. Vernon diagnosed Jackson with early COPD due to his nicotine abuse and counseled him to stop smoking. (R. at 125.) Spirometry studies revealed that Jackson had a reduction in forced vital capacity that was about 65 percent normal and a significantly diminished flow rate at about 25 percent. (R. at 125.)

Jackson returned for a yearly physical examination on October 31, 2001, and Dr. Vernon noted that Jackson had stopped smoking. (R. at 122.) Jackson reported to Dr. Vernon that he had cluster headaches, but had not had any during the previous three years, and that he had gastroesophageal reflux disease, ("GERD"), which he treated with antacids. (R. at 122.) Dr. Vernon noted that Jackson's blood pressure was high and encouraged him to follow a low-salt diet. (R. at 122.) Jackson reported that he walked, hunted and stayed outside most of the time. (R. at 122.) He was diagnosed with COPD and GERD, among other ailments. (R. at 122.) Jackson's spirometry tests showed an improvement in his lung capacity, up to 85 percent normal for forced vital capacity and a flow rate up to 47 percent. (R. at 122.)

---

[6]There are numerous, scattered, and at times, illegible notes in Dr. Vernon's records evincing Jackson's problems with headaches, insomnia, cough and congestion, heartburn, prostatitis, indigestion and other ailments. (R. at 109-77, 264-65, 288-89.) These notes provide little probative value to the determination of Jackson's disability, date as far back as 1989 and will not be discussed in the facts section of the Memorandum Opinion.

Case 1:07-cv-00056-PMS   Document 13   Filed 02/13/08   Page 7 of 26   Pageid#: 374

Jackson returned to Dr. Vernon's office on February 20, 2002, complaining of symptoms related to high blood pressure. (R. at 121.) Jackson was diagnosed with hypertension, and it was noted that he had an elevated liver function test and elevated liver enzyme levels. (R. at 121.) On March 13, 2002, Jackson complained of a recent upper respiratory infection that resulted in hospitalization. (R. at 120.) Jackson reported that he had stopped smoking for the previous several days, but Dr. Vernon noted nicotine abuse. (R. at 120.) He was diagnosed with hypertension and an upper respiratory infection. (R. at 120.)

On September 23, 2002, Jackson was seen by Dr. Vernon for a yearly physical examination. (R. at 118.) Dr. Vernon noted that Jackson continued to have problems with nicotine dependence, COPD and hypertension. (R. at 118.) A spirometry report from SCCH, on October 7, 2002, indicated that Jackson had a minimal obstructive lung defect, confirmed by an increased residual volume, and an airway obstruction, confirmed by the decrease in flow rate at peak flow and flow at 50 percent and 75 percent of the flow volume curve. (R. at 223.) At that time, Jackson was diagnosed by a SCCH physician with mild obstructive lung disease. (R. at 223.) A chest x-ray on October 23, 2002, revealed nothing acute, but could not exclude mild COPD manifestations. (R. at 221.) On April 2, 2003, Jackson presented to Dr. Vernon, complaining of pain in his right elbow. (R. at 116.) Dr. Vernon diagnosed Jackson with tendinitis in his right elbow and administered an injection of Kenalog. (R. at 116.) Jackson was again encouraged to quit smoking. (R. at 116.)

Jackson presented to Dr. Vernon on February 23, 2004, complaining of dizziness, right eye twitching, a sensation of pressure in his right ear, continued right elbow pain and pain in his right shoulder and right hip. (R. at 115.) Dr.

Vernon's examination revealed pain and tenderness to palpation of the right shoulder and tenderness over the trochanteric bursa of the right hip. (R. at 115.) Jackson was diagnosed with right shoulder tendinitis and right hip bursitis. (R. at 115.) Dr. Vernon also noted that Jackson had numbness in his thumb and first two fingers of his hands, which occurred mostly at night and was probably indicative of carpal tunnel syndrome. (R. at 115.) Jackson was given an injection in his right shoulder. (R. at 115.) On October 20, 2004, a note from Dr. Vernon's office indicated that Jackson pulled something in the left side of his lower back. (R. at 114.) The note also indicated that Jackson telephoned the office and reported that ibuprofen was not helping his pain. (R. at 114.)

A consultative examination was conducted by Dr. William Humphries, M.D., on December 21, 2004. (R. at 224-28.) Upon examination, Jackson was found to have high blood pressure, slightly reduced neck and back range of motion, ("ROM"), no kyphosis, scoliosis or paravertebral muscle spasms, but mild tenderness to palpation of the paraspinous muscles of the lower lumbar spine. (R. at 225.) Jackson had a negative straight leg raise test to 90 degrees. (R. at 225.) Jackson also had full joint ROM of the upper extremities with the exception of his shoulders and his hands. (R. at 225.) His shoulder motion was slightly reduced with the right being worse than the left, while the interphalangeal joints of both hands were found to have mild synovial thickening. (R. at 225.) Dr. Humphries also found mild tenderness to palpation of the lateral condyle of the right elbow, but no increased elbow pain with shaking hands, as Jackson was noted to have a strong grip. (R. at 225.) Joint ROM of the lower extremities was full with the exception of "back pain elicited on extremes of motion of both hips." (R. at 225-26.)

A neurological examination performed by Dr. Humphries revealed bilaterally intact radial, median and ulnar nerve functions, an adequate finger to nose test, negative Romberg's sign,[7] normal strength in four extremities, no motor or sensory loss of the extremities and adequate fine manipulation. (R. at 226.) Jackson was diagnosed with post-traumatic epicondylitis of the right elbow, right shoulder strain, chronic lumbar strain with mild peripheral neuropathy into the right lower extremity and mild degenerative joint disease in his hands. (R. at 226.) Based on Dr. Humphries's objective findings, he determined that Jackson would be limited to sitting, standing and walking six hours in a typical eight-hour workday and lifting items weighing up to 15 pounds occasionally and items weighing up to 25 pounds frequently. (R. at 226-27.) Jackson was found to have no restrictions with regard to heights, hazards or fumes, but it was noted that he would not be able to perform overhead work. (R. at 227.) Dr. Humphries further determined that Jackson would have no limits on climbing, stooping, kneeling, crouching or crawling unless imaging of the lumbar spine revealed degenerative joint disease or degenerative disc disease, in which case, Jackson would be limited to occasional stooping or crouching. (R. at 227.) X-rays of the lumbar spine and right hip, taken on the same date as Dr. Humphries's examination, revealed that Jackson had a "normal right hip" and a "normal lumbar spine." (R. at 229.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on February 4, 2005. (R. at 230-36.) Dr. Hartman found that Jackson was able to occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items

---

[7]Romberg's sign is s swaying of the body or falling when standing with the feet close together and the eyes closed. Observed in individuals with a slowly progressive degeneration of the posterior columns and posterior roots and ganglia of the spinal cord. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1525, 1658 (27th ed. 1988).

weighing up to 25 pounds, stand and/or walk for a total of six hours in a typical eight-hour workday and sit for a total of six hours in a typical eight-hour workday. (R. at 231.) Dr. Hartman also noted that Jackson had an unlimited ability to push and/or pull. (R. at 231.) Dr. Hartman imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 232-33.) He determined that the medical evidence established medically determinable impairments of chronic lumbar strain, post-traumatic epicondylitis of the right elbow, right shoulder strain and mild degenerative joint disease of the hands. (R. at 235.) Dr. Hartman found Jackson's statements regarding his symptoms to be partially credible. (R. at 235.) Dr. Hartman also noted that examination findings of Dr. Humphries were not given full weight due to inconsistencies with the totality of the evidence on file. (R. at 235.) Dr. Frank M. Johnson, M.D., another state agency physician, reviewed Dr. Hartman's report and affirmed his findings on May 27, 2005. (R. at 234.)

On March 21, 2005, Jackson returned to Dr. Vernon's office for a follow-up visit regarding his chronic back pain, shoulder pain and COPD. (R. at 112.) Dr. Vernon noted that Jackson had chronic lower back pain with some radiation of the pain to the right hip, but no radiation down the leg. (R. at 112.) Dr. Vernon added that the pain was aggravated by walking or standing, while sitting caused stiffness. (R. at 112.) He also added that Jackson could sit for only 15 to 20 minutes before he started to get stiff, and that his pain increased with walking or standing. (R. at 112.) In order to avoid his pain, Dr. Vernon noted that Jackson changed positions between sitting and walking or standing every 15 minutes, and that when driving, he stopped his vehicle every 30 to 40 minutes to get out and walk. (R. at 112.) Dr. Vernon also stated that Jackson had pain in his right forearm, right biceps and right shoulder. (R. at 112.) It was noted that Jackson continued to smoke and experience shortness of breath, while tests showed that his lung capacity was 72 percent

normal for forced vital capacity and his flow rate was 43 percent. (R. at 122.) Dr. Vernon's physical examination revealed that Jackson's deep tendon reflexes were symmetrical and equal, that Jackson was able to bend 90 degrees at the waist, that he was able to raise both arms straight up with pain in his right arm, that Jackson's grip was good, but that twisting his hands resulted in pain in the area distal to the right elbow. (R. at 112.) Jackson was diagnosed with chronic back pain, chronic bronchitis/emphysema and right elbow and bicep pain. (R. at 112.)

At the request of Jackson's attorney, Dr. Vernon also completed a Physical Capacities Evaluation form on March 21, 2005. (R. at 148.) Dr. Vernon reported that Jackson could sit for one hour at a time, stand or walk for 30 minutes at a time, sit for a total of four hours and stand or walk for a total of two hours in a typical eight-hour workday. (R. at 148.) Dr. Vernon also reported that Jackson could frequently lift items weighing up to 10 pounds, occasionally lift items weighing up to 50 pounds, frequently carry items weighing up to 10 pounds and occasionally carry items weighing up to 25 pounds. (R. at 148.) Dr. Vernon further concluded that Jackson could not use his right hand for simple grasping or pushing and pulling, but could use his right hand for fine manipulation, and he noted no limitations on his left arm or his feet. (R. at 148.) Dr. Vernon found that Jackson could frequently squat and occasionally bend, crawl, climb and reach; that he had mild restrictions of activities involving being around machinery, exposure to marked changes in temperature and humidity and driving automobile equipment; and moderate restrictions of activities involving unprotected heights and exposure to dust, fumes and gases. (R. at 148.) Dr. Vernon further noted that Jackson would have significant functional limitations due to chronic bronchitis. (R. at 148.)

Jackson returned to Dr. Vernon's office on July 19, 2005, complaining of pain in his right shoulder and lower back. (R. at 110.) Dr. Vernon reported that any internal rotation of the shoulder resulted in pain, and significant pain resulted when Jackson raised his arm above "about 110 degrees." (R. at 110.) Jackson was smoke-free for about two weeks prior to the July 19 visit. (R. at 110.) He was diagnosed with a questionable right rotator cuff injury, chronic lower back pain and COPD. (R. at 110.)

On July 20, 2005, Jackson underwent a magnetic resonance image, ("MRI"), of his lumbar spine. (R. at 243.) The MRI revealed no significant herniated nucleus pulposus or evidence of central spinal stenosis. (R. at 243.) The MRI revealed a mild annual bulging of the L4-5 intervertebral disc and opacity of epidural fat within the left lateral recess at the L4-5 level. (R. at 243.) X-rays of the right shoulder, then on July 22, 2005, revealed no destructive lesion or fracture. (R. at 241.)

Jackson underwent an MRI of his right shoulder on August 3, 2005. (R. at 145, 239.) The MRI revealed a tear of the supraspinatus tendon, which was noted as at least a significant partial tear and possibly a full thickness tear. (R. at 145, 239.) The MRI also revealed a subacromial clearance decreased at six millimeters, arthritic changes at the insertion site for the supraspinatus tendon and findings suspicious of impingement syndrome. (R. at 145, 239.) As a result of these findings, Dr. Beth Steinberger, D.O., referred Jackson to an orthopedic physician. (R. at 144-45.) On August 5, 2005, Jackson was seen in Dr. Vernon's office to discuss the MRI findings. (R. at 109, 259.) At that time, the August 3 MRI results were unknown to Dr. Vernon, but he noted that Jackson was still having pain, and he suspected a rotator cuff tear or significant tendinitis. (R. at 109, 259.)

Jackson presented to Dr. Ralph Parks, M.D., on August 17, 2005, for an orthopedic consultation. (R. at 246.) Dr. Parks noted that Jackson demonstrated an active ROM, but that he had pain with adduction against resistance. (R. at 246.) Dr. Parks's physical examination also revealed a positive abduction test, decreased and painful external rotation, a positive straight arm raise test and impingement sign and tenderness over the long head of the biceps tendon. (R. at 246-47.) X-rays revealed a degenerative acromioclavicular, ("AC"), joint, and revealed that the humeral head was well seated in the glenoid fossa. (R. at 247.) Dr. Parks referenced an MRI that showed findings of impingement and a partial rotator cuff tear involving the supraspinatus tendon. (R. at 247.) Jackson was diagnosed with chronic impingement syndrome of the right shoulder and degenerative joint disease of the AC joint with a rotator cuff tear along the supraspinatus tendon, and his right shoulder was injected with Marcaine and Kenalog. (R. at 247.) Jackson also was instructed to undergo physical therapy. (R. at 247.)

On August 23, 2005, Jackson presented to SCCH physical therapy for instruction on how to proceed with a home exercise program. (R. at 248-56.) Jackson informed SCCH physical therapy that he had been disabled for two years and that he was seeking help with his right arm, shoulder and back pain. (R. at 253.) Jackson was given instructions on a home exercise program, including information on types and frequency of exercises and goals. (R. at 248.) Jackson returned to Dr. Parks on September 7, 2005, and noted that his shoulder was about 10 percent improved after attending therapy and learning to perform a home exercise program. (R. at 245.) Dr. Parks's physical examination revealed a guarded, but functional ROM in the right shoulder, some limitations in external rotation and a positive impingement sign. (R. at 245.) Jackson was again injected

with Marcaine and Kenalog, instructed to continue his home exercise program and was instructed on the possible need for arthroscopic decompression.  (R. at 245.)

On October 19, 2005, Jackson presented to Dr. Parks for a follow-up visit regarding his shoulder.  (R. at 244.)  Jackson's active ROM was guarded, but he was able to reach forward to his shoulder level and the axilla of his left arm.  (R. at 244.)  Passively, Jackson could tolerate flexion to 130 degrees, but it was noted that Jackson had an "occasional click." (R. at 244.)  He was diagnosed with chronic impingement syndrome and severe capsulitis of the right shoulder.  (R. at 244.)  Dr. Parks's treatment was similar to previous visits, with the addition of a home pulley system to Jackson's home exercise program.  (R. at 244.)

Jackson presented to Dr. Vernon on April 12, 2006, with hip, back and right shoulder pain.  (R. at 257.)  Dr. Vernon's treatment notes on this date are mostly illegible, but indicate that Jackson was diagnosed with impingement of the right shoulder and early COPD.  (R. at 257.)  On April 24, 2006, Dr. Parks reported that Jackson developed further pain and stiffness with his right shoulder, noting that he could forward flex to only 80 degrees and that "[r]otation with external and internal is decreased."  (R. at 261.)  Jackson was injected with Marcaine and Celestone Soluspan and was instructed to continue his home exercise program.  (R. at 261.)

On May 17, 2006, Dr. Vernon completed a Clinical Assessment of Pain form for Jackson, indicating that Jackson's pain was present to such an extent as to be distracting to the adequate performance of daily activities or work.  (R. at 264.)  The form also noted that physical activity, such as walking, standing and bending greatly increased pain, causing abandonment of tasks related to daily activities or

work and that medication would severely limit Jackson's effectiveness in the work place. (R. at 264.)

Dr. Vernon completed a second Physical Capacities Evaluation form for Jackson on May 22, 2006. (R. at 265.) Dr. Vernon opined that Jackson could sit for one hour at a time in a typical eight-hour workday, stand or walk for 30 minutes at a time in a typical eight-hour workday, and sit for a total of four hours and stand or walk for a total of two hours in a typical eight-hour workday. (R. at 265.) Dr. Vernon also reported that Jackson could frequently lift items weighing up to 20 pounds with his left arm, occasionally lift items weighing up to 25 pounds with his left arm and never lift any items with his right arm. (R. at 265.) Dr. Vernon found that Jackson could frequently carry items weighing up to 10 pounds and occasionally carry items weighing up to 25 pounds. (R. at 265.) Dr. Vernon further concluded that Jackson could not use his right hand for simple grasping or pushing and pulling, but could use his right hand for fine manipulation, and he noted no limitations on Jackson's left arm or his feet. (R. at 265.) Dr. Vernon found that Jackson could never squat, but could occasionally bend, crawl, climb and reach; that he had mild restrictions on activities involving being around machinery, exposure to marked changes in temperature and humidity and driving automobile equipment; and moderate restrictions on activities involving unprotected heights and exposure to dust, fumes and gases. (R. at 265.) Dr. Vernon further noted that Jackson would have limited respiratory function due to emphysema. (R. at 265.) A chest x-ray taken on May 24, 2006, revealed that Jackson had no acute chest abnormality, but it indicated "[m]ild hyperexpansion that could reflect underlying COPD." (R. at 266.)

Case 1:07-cv-00056-PMS   Document 13   Filed 02/13/08   Page 16 of 26   Pageid#: 383

On June 5, 2006, Dr. Parks remarked that Jackson was exercising and was seeing improvement in his right shoulder. (R. at 274.) Jackson demonstrated "much improved range of motion," and Dr. Parks noted that Jackson could reach the overhead position from flexion to 150 degrees, but that Jackson was guarded with his active ROM and his strength was "a little down." (R. at 274.) Jackson was diagnosed with chronic impingement syndrome and a partial rotator cuff tear of the right shoulder. (R. at 274.) On July 19, 2006, notes from the Smyth County Community Hospital Outreach Clinics stated that Jackson reported his shoulder was "killing him" and asked if Dr. Vernon could prescribe any medication for him. (R. at 279.) Dr. Vernon prescribed Celebrex, which was later changed to ibuprofen, because Jackson's insurance would not cover Celebrex. (R. at 279.)

Jackson was again diagnosed with chronic impingement syndrome and a partial rotator cuff tear of the right shoulder on August 9, 2006, when Dr. Parks noted that Jackson continued to be symptomatic with his right shoulder. (R. at 276.) At that time, Jackson could forward flex and lateral abduct greater than 90 degrees, and his external and internal rotation was restricted. (R. at 276.) Jackson was given an injection of Marcaine and Kenalog and was instructed to continue his home exercise program. (R. at 276.)

On August 25, 2006, Jackson presented to Dr. Vernon for a follow-up regarding his shoulder, lower back and right hip pain. (R. at 278.) Dr. Vernon noted that Jackson received "some relief" for two weeks after having a steroid injection, and that he was scheduled to return to Dr. Parks for further treatment. (R. at 278.) Jackson could lift his right arm only 45 degrees, and he was diagnosed with chronic impingement syndrome in his right shoulder, mechanical lower back pain and COPD. (R. at 278.)

Jackson returned to Dr. Parks's office on September 20, 2006, for a follow-up visit regarding his right shoulder. (R. at 275.) Dr. Parks noted that Jackson was continuing to have activity-related pain in his right shoulder. (R. at 275.) Upon examination, Jackson's forward flexion and abduction against gravity were limited, his shoulder reached the overhead position and he showed little residual loss of external and internal rotation. (R. at 275.) Jackson was given an injection of Marcaine and Celestone Soluspan to the right shoulder and was instructed to continue his home exercise plan. (R. at 275.) Dr. Parks noted that if "symptoms continue as they are at present, arthroscopy of the shoulder and rotator cuff decompression and/or repair will be necessary." (R. at 275.)

Jackson presented to Dr. Carey W. McKain, M.D., of Abingdon Orthopedic Associates, on April 3, 2007.[8] (R. at 286.) Dr. McKain reported that Jackson did not feel "that the exercises have helped him." (R. at 286.) Dr. McKain discussed the need for surgery with Jackson, and noted that he "presume[d] the cuff is more retracted than before." (R. at 286.) Dr. McKain explained the dangers of waiting on surgery to Jackson, but Jackson wanted to wait until his disability was determined before pursuing surgery. (R. at 286.)

On May 4, 2007, Jackson returned to Dr. Vernon for a follow-up visit regarding his COPD and right shoulder pain. (R. at 288.) Jackson informed Dr. Vernon that surgery was advised by Dr. McKain. (R. at 288.) Jackson's ROM

---

[8]Dr. McKain noted that, "Douglas Jackson is no different," and "[h]is exam is truly without change." (R. at 286.) However, this entry is the only record found in the administrative transcript from Dr. McKain. It is unclear if Dr. McKain is referring to a previous visit or other medical records.

was limited in his right shoulder, and he was diagnosed with COPD and a right rotator cuff tear, among other ailments. (R. at 288.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. If the claimant is able to establish a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 17, 2006, the ALJ denied Jackson's claim. (R. at 17-23.) The ALJ found that Jackson had a medically determinable severe impairment, when his right shoulder disorder, post-traumatic epicondylitis of the right elbow, chronic lumbar strain and degenerative joint disease of the hands were considered in combination. (R. at 22.) However, the ALJ found that Jackson's impairments, considered either singly or in combination, did not meet or equal the criteria of any impairments listed at, or medically equal to one listed at, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 22.) The ALJ also found that Jackson's allegations regarding his limitations were not fully credible. (R. at 22.) The ALJ determined that Jackson had the residual functional capacity to lift and carry items weighing up to 25 pounds occasionally and 15 pounds frequently, and that Jackson could stand and/or walk and sit for six hours in a typical eight-hour workday. (R. at 20, 22.) The ALJ also found that Jackson's past relevant work as a production manager, did not require the performance of work-related activities precluded by Jackson's residual functional capacity, and that Jackson's impairments did not prevent him from performing his past relevant work. (R. at 22.) Thus, the ALJ found that Jackson was not disabled at any time through at least the date of the ALJ's decision and was not entitled to DIB benefits. (R. at 22-23.) *See* 20 C.F.R. § 404.1520(f) (2007).

Jackson argues that the ALJ's decision was not supported by substantial evidence. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) Specifically, Jackson argues that the ALJ erred in rejecting the restrictions placed upon him by Dr. Vernon, instead relying on the assessments of the state agency physicians. (Plaintiff's Brief at 8-9.) Secondly, Jackson argues that the ALJ erred in determining that Jackson could perform his previous job as a production manager. (Plaintiff's Brief at 10-11.) Thirdly, Jackson argues that the

ALJ erroneously based his decision on Jackson's inability to afford medical treatment. (Plaintiff's Brief at 11-12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, if his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jackson's first argument is that the ALJ erred in rejecting the restrictions placed upon him by Dr. Vernon, instead relying on the assessments of the state agency physicians. (Plaintiff's Brief at 8-9.) Jackson argues that the ALJ should have recognized that Jackson was limited in the use of his right arm, and that Dr. Vernon's opinion is entitled controlling weight because he is a treating physician. (Plaintiff's Brief at 9.) An ALJ has a duty to weigh the evidence in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). The ALJ, therefore, has a duty to indicate explicitly that he has weighed all relevant evidence, indicate the weight given to this evidence and sufficiently explain his rationale in crediting the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). As a result, this court does not weigh the evidence; rather the court's function is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. *See Hays*, 907 F.2d at 1456. While an ALJ may not reject medical

Case 1:07-cv-00056-PMS   Document 13   Filed 02/13/08   Page 21 of 26   Pageid#: 388

evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d) if he sufficiently explains his rationale and if the record supports his findings.

As the ALJ noted, he "carefully considered the opinions of Dr. Humphries, Dr. Vernon and the [s]tate [a]gency physicians." (R. at 21.) The ALJ accepted, in part, the opinion of Dr. Humphries, who is an examining physician. While the ALJ did not accept Dr. Humphries's limitation from performing overhead work, he noted that this assessment was not supported by Dr. Humphries's own examination, which revealed only "slightly" reduced shoulder motion. (R. at 21.) Further, he noted that more current evidence "documents improved range of motion, specifically that the claimant can reach the overhead position from flexion to 150 degrees." (R. at 21.) The ALJ also noted that the state agency physicians "opined that the claimant could perform a full range of medium work."[9] (R. at 21.) Lastly, the ALJ realized his role in weighing the evidence, and noted that "[w]hile Dr. Vernon is a treating source and his opinion is entitled to certain deference, such opinion must be supported and must be consistent with other reliable evidence of record." (R. at 21.)

Thus, the ALJ did not err in limiting the weight he assigned to Dr. Vernon's opinion because it conflicted with other evidence in the record. *See* 20 C.F.R. § 404.1527 (2007). The "ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."

---

[9]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[10]  Because substantial evidence exists in the record to support the ALJ's findings, Jackson's argument is without merit.  *See Hays*, 907 F.2d at 1456.

Secondly, Jackson argues that the ALJ erred in determining that Jackson could perform his previous job as a production manager.  (Plaintiff's Brief at 10-11.)  Insofar as Jackson argues that the ALJ did not sufficiently explain his rationale in crediting the evidence, I agree.  Jackson testified that his past work required him to lift crankcases which weighed 50 pounds.  (R. at 301.)  On forms he completed for the Social Security Administration, Jackson noted that the heaviest weight he lifted was less than 10 pounds, (R. at 59), and 20 pounds.  (R. at 104.)  The ALJ determined that Jackson's past relevant work required Jackson to perform work at the light level[11] of exertion,[12] and he also found that Jackson had

---

[10]*Hunter* was superseded by 20 C.F.R. § 404.1527(d)(2), which states in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2) (2007).
[11]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If an individual can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. § 404.1567(b) (2007).
[12]The ALJ characterizes Jackson's prior work experience according to the Dictionary of Occupational Titles.  (R. at 21.)  While an ALJ may rely on general job categories of the Dictionary of Occupational Titles as presumptively applicable to a claimant's prior work, the same label, however, may be used in a variety of ways, and may not be applicable to a claimant's specific prior job.  *See DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983).  On remand, the ALJ may consider additional evidence on the proper characterization of Jackson's past relevant work; it may be possible that the ALJ can demonstrate that both Jackson's specific prior job and his occupation are properly termed "light."  *DeLoatche*, 715 F.2d at 151.  However, on the present record, such a determination cannot be upheld.

the residual functional capacity to lift and/or carry items weighing up to 25 pounds occasionally and up to 15 pounds frequently. (R. at 21-22.) However, the ALJ should have stated his reasons for rejecting or discounting Jackson's testimony that he occasionally lifted items weighing up to 50 pounds while employed as a production manager. (R. at 301.) *See Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir. 1987) (superseded on other grounds). It was error for the ALJ to classify Jackson's past work experience as requiring light exertion, without explaining the reasons for discounting Jackson's testimony that he occasionally lifted items weighing up to 50 pounds. *See Bowen*, 837 F.2d at 637. Because the ALJ did not explicitly indicate the weight given to all the relevant evidence, I cannot determine if the findings are supported by substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). On remand, the ALJ should sufficiently explain the weight given to evidence which is relevant to his decision that Jackson's past work was performed at the light level of exertion, including Jackson's disability reports, his past work history reports and his testimony at the hearing.

Thirdly, Jackson argues that the ALJ's statement that "surgery has not been recommended," (R. at 20), indicates that the ALJ based his decision on Jackson's

Case 1:07-cv-00056-PMS   Document 13   Filed 02/13/08   Page 24 of 26   Pageid#: 391

inability to afford medical treatment. (Plaintiff's Brief at 11-12.) I disagree. Nothing in the ALJ's opinion indicates that he based his decision on the claimant's inability to pay for treatment. While Jackson argues that surgery had been recommended, there is no evidence to indicate that Jackson's inability to pay for surgery affected his treatment or the ALJ's decision. In fact, Dr. Parks only noted that, "arthroscopic decompression may become necessary." (R. at 245.) Further, at Jackson's hearing, he testified that his physician had not recommended surgery. (R. at 298.) A visit to Dr. Parks, after the ALJ's decision, revealed that, "if symptoms continue . . . repair will be necessary." (R. at 275.) There is no evidence to indicate that a decision not to undergo surgery was based on Jackson's inability to pay, and there certainly is no evidence that the ALJ based his decision on such. While evidence later submitted to the Appeals Council indicated that Jackson might need surgery on his shoulder, it does not indicate that Jackson's inability to pay prevented him from having the surgery. (R. at 286.) Rather, Jackson wanted to delay undergoing surgery because "his disability ha[d] not yet been determined." (R. at 286.)

## IV. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and this case will be remanded to the Commissioner for further consideration.

I further deny Jackson's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:  This 13th day of February 2008.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE